Buckeye Coal Company, a Corporation, Appellant, *v.* Maurice K. Goddard, Secretary, Department of Environmental Resources; and J. M. Muchnok, Jr., Commission of Bituminous Mine Inspectors; and Commonwealth of Pennsylvania, Appellees.

Argued April 17, 1973, before Judge ROGERS. Exceptions argued August 1, 1973, before Judges CRUMLISH, JR., WILKINSON, JR., and ROGERS, sitting as a panel of three.

*Harold R. Schmidt,* with him *Henry McC. Ingram, Philip C. Wolf,* and *Rose, Schmidt and Dixon,* for appellant.

*John W. Carroll,* Special Assistant Attorney General, with him *Robert Lesko,* Assistant Attorney General, for appellees.

OPINION AND ORDER BY JUDGE ROGERS, June 7, 1973:
The Buckeye Coal Company ("Company") has appealed to this court from the decision of a commission appointed by the Secretary of the Department of Environmental Resources to examine into the matter of an appealed decision of a district mine inspector. The governing statute is the Pennsylvania Bituminous Coal Mine Act, Act of July 17, 1961, P. L. 659, 52 P.S. §701-101 et seq., Section 123 of which (52 P.S. §701-123) describes the procedures before our court as follows: "The mine inspector shall exercise sound discretion in the performance of his duties under the provisions of this act, and if the operator, superintendent, mine foreman, or other person employed in or about any mine, shall be dissatisfied with any decision the mine inspector has given in the discharge of his duties, which decision shall be in writing, it shall be the duty of the dissatisfied person to appeal from said decision to the secretary, who shall at once appoint a commission to accompany promptly the mine inspector in the district

18

to make further examination into the matter in dispute. If the said commission shall agree with the decision of the mine inspector in the district, their decision shall be final and conclusive, unless the dissatisfied person shall, within seven days of the receipt of the decision of the commission, appeal therefrom to the court of common pleas of the county in which said mine, or a portion thereof, is situated. Whereupon, the court, or a judge of said court, in open court or in chambers, shall promptly hear such appeal, and shall permit testimony and argument, oral or written, or both, by both parties. In such appeal, the appellant shall be designated the plaintiff and the secretary shall be the defendant. Within five days after conclusion of testimony and argument, the said court shall issue such decision and order as may be proper and appropriate under the circumstances. Such decision shall be final, subject only to review by the Superior Court upon a petition for certiorari filed in such court within sixty days from the entry of said decision and order. Said appeal to the said court of common pleas shall act as a supersedeas of the decision of the Commission."

While our jurisdiction is not a specific issue raised by either party, it is involved. We are advised that Company, as a precaution, has also filed an appeal pursuant to Section 123, *supra*, in the Court of Common Pleas of Greene County. Jurisdiction is in this Court, not the Court of Common Pleas of Greene County. Section 123 was repealed by the Appellate Court Jurisdiction Act of 1970 insofar as it vests jurisdiction and powers in courts in any matter inconsistent therewith. Act of July 31, 1970, P. L. 673, §509(g)(55), added by Act of June 3, 1971, P. L.        , 17 P.S. §211.509(g) (55). In *Hartman v. Commonwealth*, 6 Pa. Commonwealth Ct. 409, 295 A. 2d 850 (1972), we held that provisions of The Vehicle Code identical to Section 123

and identically affected by the Appellate Court Jurisdiction Act, demonstrated legislative intent that this Court should have jurisdiction.

Having thus determined that we had jurisdiction, we received the evidence proffered by the parties in extensive hearings. After review of such testimony as has been transcribed, our notes as to the rest and oral argument, we make the following:

### Findings of Fact

(1) The Buckeye Coal Company, ("Company"), a subsidiary of Youngstown Sheet and Tube Company, is the owner and operator of a bituminous coal mine located in Greene County and known as the Nemacolin Mine.

(2) The Nemacolin mine is located within the so-called Pittsburgh seam, a rich deposit of bituminous coal stretching almost uninterruptedly from Charleston, West Virginia to Windber Borough, near the northern boundary of Somerset County, Pennsylvania.

(3) At the Nemacolin mine the Pittsburgh seam is about 400 feet below the surface of the land. The Nemacolin mine is a so-called shaft mine, that is, one in which the coal is reached by shafts dug to the level of the seam, although in the case of Nemacolin there is at least one point at which there is an opening at the surface through which access can be had by foot over a slope to the workings.

(4) The Nemacolin mine is bounded on one side by the Monongahela River and the coal seam is below the level of the river. As a result of this and other factors, the earth at the level of the coal seam of the Nemacolin mine has been saturated with water for eons.

(5) The Pittsburgh seam is about eight feet thick. It is mined at Nemacolin by driving corridors through the seam. These corridors are variously called entries,

rooms or headings. From these corridors, which we will hereafter refer to as entries, other corridors, called crosscuts, are driven at right angles, leaving a grid pattern of entries and crosscuts. The coal left at the intersections of the entries with the crosscuts, are called pillars and they provide roof support for the entries and crosscuts.

(6) The process of driving the entries and the crosscuts is called development of the mine. After the development of a portion of the mine is completed the pillars of coal are removed commencing at a place farthest from the entrance. This process is called retreating.

(7) The entries and crosscuts are about 17 feet wide. At the right angle intersections of entries and crosscuts, the diagonal dimension of the open spaces are about 24 feet.

(8) The entries and crosscuts are about seven feet high. This height provides a roof of coal about one foot thick for the entries and crosscuts.

(9) Above the said roof of coal in the Nemacolin mine, there are layers of slate, shale and so-called rooster coal of a total thickness of four or five feet. Above this fractured material is a bed of sandstone as much as 50 feet thick.

(10) The stratum of sandstone in the Nemacolin mine is massive and competent. A competent rock is one capable of supporting that which is above it.

(11) Roof support, in addition to that provided by the coal pillars in the Nemacolin mine, is prescribed by a Roof Support Plan approved by the United States Department of the Interior, Bureau of Mines, and the Department of Environmental Resources.

(12) The approved roof plan of the Nemacolin mine authorizes the use of roof bolts as a means of roof support.

(13) Roof bolts are rods, six to eight feet in length and about five-eighths of an inch in diameter, on one end of which is an expanding shell anchor. The roof bolt is inserted in a previously drilled hole through the roof of the mine and the overlying slate and shale and into the massive competent sandstone. It is bolted to the sandstone by means of the expanding shell anchor.

(14) The roof bolt is also passed through a wooden header block and a steel plate which are placed against the mine roof. By tightening of the bolt, the block and plate are pressed against the roof and held there by the bolt anchored in the sandstone above. One witness accurately described roof bolting as the nailing of a ceiling to rafters.

(15) In the Nemacolin mine the bolts are placed four feet apart longitudinally and transversely.

(16) The Nemacolin roof plan provides for other means of roof support where roof bolts cannot be used, that is, where the bolts cannot be adequately anchored in the sandstone. These other means of support are "cross timbering," which consists of posts on either side of the corridor on the top of which are affixed timbers against the roof, and "center-posting," which is the placement of posts in the middle of the entries or cross-cuts.

(17) The roof of the Nemacolin mine is less subject to falls than roofs of 60 per cent of the mines in the Pittsburgh seam.

(18) The holding quality of roof bolts is determined by taking tests, by means of torque wrenches, which measure the amount of pressure necessary to turn the bolt. If the bolt turns too easily the indication is that it is not supporting the roof and is therefore not anchored in a sufficient beam; if too much energy is necessary to turn the bolt the indication is that there is excessive weight on the bolt.

(19) Roof bolting is an acceptable means of roof support and has been in use in the Pittsburgh seam for upwards of 20 years.

(20) The Nemacolin mine is divided into sections which are given names. One such section, called the 118 Road Section, consists of seven entries numbered 1 through 7, and of fifteen crosscuts numbered 1 through 15.

(21) In March 1971, a fire broke out in the 118 Road Section of the Nemacolin mine. Efforts were made to fight the fire underground and by the introduction of slag until sometime in April, 1971 when it was determined that the only way to extinguish the fire was by flooding. Bulkheads were constructed for this purpose and the mine flooded to depth which immersed the entries, the crosscuts and the overburden, including the shale above the roof.

(22) The flooding was completed in September 1971 and the mine remained flooded until about September 1972.

(23) Between March of 1971 and September 1972, the Company engaged in cutting through the coal in other sections in the direction of the 118 Road Section, which was reached on September 14, 1972. Thereupon a mine rescue team explored the 118 Road Section and a map was made by persons on the surface by recording on a plan of the mine observations transmitted by telephone from below.

(24) The observations of the mine rescue team included descriptions of roof conditions as being good in many places in the 118 Road Section.

(25) The work of inspection continued until the bodies of the two victims of the fire were brought out in September or October 1972.

(26) After the inspection of the mine in September and October of 1972, the Company decided that it would

not thereafter do further mining in the 118 Road Section or other sections of the mine affected by the fire and water but that it would, after removing the machinery and equipment which was there at the time of the fire, use entries numbered 2 and 4 of the 118 Road Section for intake airways and entry number 6 as a return airway for ventilation to another section of the mine and to use all three as alternate escapeways from other areas of the mine.

(27) In addition, the Company proposes to use as an airway and alternate escape route, a succession of entries and crosscuts connecting with entry 4 and extending to a bulkhead numbered 15, to be referred to hereafter as the extension.

(28) Such use of the three entries would, during the period of recovery of equipment, require the use of trackage presently located in entries 2 and 4. The provision of ventilation would also require the construction of air stoppings in the vicinity, necessitating the use of the tracks. It is estimated by the Company that the period of time during which the tracks would be used for the purpose of removing machinery and equipment and constructing stoppings would be about four months, after which, except for required weekly inspections of the three entries by one person, the 118 Road Section would not be used.

(29) The district mine inspector, in concert with the Director of the Bureau of Deep Mine Safety of the Department of Environmental Resources, after some rehabilitation work had been done in the 118 Road Section, decided that the Company could not use any of the Section without cross timbering the whole.

(30) On appeal from the inspector's order a commission consisting of State inspectors from other districts visited the mine once and ordered that the two entries in which tracks were located and were to be

used should be cross timbered and that all other places where anyone would in the future travel for any purpose should be center-posted at four-foot intervals.

(31) The Company, believing that much of the roof in the section was adequately supported by roof bolts, appealed the Commission order to this Court.

(32) The area of most intense fire is located about 500 or 600 feet from entries 2, 4 or 6 and about 2000 feet from the facings of 118 Road Section.

(33) About 400 torque tests were taken by the Federal Bureau of Mines and the same number by the Commission in entries 2, 4 and 6 and those indicated that the roof was adequately supported in most areas.

(34) The Federal Bureau made pull tests on seven bolts and these were properly anchored.

(35) The Federal Bureau and some of the Company's experts made stratascope observations of the materials in the roof and observed no deterioration of the shale, slate, roof coal, sandstone or other materials.

(36) Tensile strength tests made by the Federal Bureau and the Company proved that the bolts and metal plates were unaffected by fire or water.

(37) The existing roof bolts offer adequate roof support in most of the areas of 2, 4 and 6 entries.

(38) The coal forming the roof of the entries was not affected by water.

(39) The roof bolts were not weakened by water.

(40) The slate, shale, rooster coal and other materials overlying the roof of entries 2, 4 and 6 were not so affected by fire or water as to increase the danger of falls.

(41) The Company's plan provides adequate additional roof support in those areas of entries 2, 4 and 6 where by reason of fire the roof has fallen or otherwise been affected.

(42) Except in entry 6 between crosscuts 8 and 10 and in other areas where the Company has or proposes additional support, the roof of entries 2, 4 and 6 and the extension of 6 as shown on Exhibit P-3 into the 118 Road Mains Left Section is adequately supported by roof bolts.

(43) The extension of entry 4 to bulkhead 15 shown on Exhibit P-3 has not been inspected by the Federal Bureau of Mines or any other official body and has been examined only by the mine foreman and assistant superintendent.

(44) The areas where men work the Nemacolin mine are inspected daily by foreman and fire bosses. A representative of the Federal Bureau of Mines is present at the mine some part of every day. State Inspectors make regular visitations and are on immediate call. The union safety committee can close portions of the mine temporarily as can any individual miner simply by posting "danger" signs at the affected area.

(45) The Commission's order went beyond the necessities of the case and will greatly and unnecessarily delay the provision of additional ventilation and escape ways, not required, but desired to be provided for the increased safety of persons working in the Nemacolin mine.

(46) The Company's plan for roof support suggested by its Exhibit 3 provides adequately for the support of roofs of entries 2, 4 and 6 to crosscut 15.

## DISCUSSION

The State mine inspector assigned to the Nemacolin mine decided that the areas of 118 Road Section "where men are travelling" should be cross timbered on four foot centers. The commission, consisting of three other mine inspectors which conceived its function to be "To conduct a complete and accurate investigation of

alleged dissatisfaction of the . . . Company . . . with the decision of [the] District Mine Inspector . . . in regard to the order of crossbarring the area of the 118 Road Section . . . ," decided:

"1. That all areas where men will work and travel as haulageways shall be timbered as requested by the District Mine Inspector.

"2. That return areaways where mandatory examination required by law will be made, shall be centerposted on at least four foot centers."

By Section 123, *supra,* we are told to "promptly hear such appeal, and [to] permit testimony and argument, oral or written, or both, by both parties. In such appeal, the appellant shall be designated the plaintiff and the secretary shall be the defendant. Within five days after conclusion of testimony and argument, the said court shall issue such decision and order as may be proper and appropriate under the circumstances." It is clear that what is contemplated by that provision is a *de novo* hearing and that the court shall determine the facts and make such order as it deems proper based upon the record. This is particularly evident, since unlike similar appeal provisions of The Vehicle Code,[1] the Liquor Code[2] and the several local assessment laws,[3] which come to mind as analogous, the appellant in this proceeding has had no previous hearing before the agency. This proceeding comes to us not only without a record but without prior adversary presentation of the thing in issue. We are not, therefore, limited in our review to determining whether the Commission's order is supported by the evidence as would be the case of an

---

[1] Act of April 29, 1959, P. L. 58, §620, as amended, 75 P.S. §620.

[2] Act of April 12, 1951, P. L. 90, §471, as amended, 47 P.S. §4-471.

[3] For example, The Fourth to Eighth Class County Assessment Law, Act of May 21, 1943, P. L. 571, §§702, 704, as amended, 72 P.S. §§5453.702, 5453.704.

adjudication made pursuant to the Administrative Agency Law,[4] nor are we without power to modify the questioned order as are reviewing courts in the case of motor vehicle license suspensions, nor are we prevented from altering the order as in the case of appeals from Liquor Board decisions where the findings are unchanged, nor does the Commission's order have prima facie validity as do assessment records; rather, as the first true hearing body, we render "such decision and order as may be proper and appropriate under the circumstances."

There is, therefore, no issue as to the burden of proof. We are to make our own determination from the evidence of what kind and amount of roof support is needed to assure the safety of persons who may enter the mine, considering all of the circumstances, including the use to be made of the areas in question.

Section 123, *supra,* provides further that the appellant shall be designated the plaintiff and the secretary the defendant. If this provision has significance beyond that of prescribing the caption, it is that the appellant shall have the burden of going forward with the evidence. We discern an analogy in Section 517 of the Eminent Domain Code[5] providing that at the trial of an appeal from the report of viewers the condemnee shall be the plaintiff and the condemnor the defendant. In practice, the condemnee presents his case for damages first and the condemnor follows, but the jury is charged simply to determine from all the evidence what the proper award should be. In any event, we required the appellant to go forward and it did so by introducing the Commission's report, followed by evidence that the roof support provided by existing bolting, with ad-

---

[4] Act of June 4, 1945, P. L. 1388, §44, 71 P.S. §1710.44.

[5] Act of June 22, 1964, Special Session, P. L. 84, §517, 26 P.S. §1-517.

ditional support in some places, was safe. The Department then adduced evidence in support of the commission's requirements and rebuttal and surrebuttal followed. We must now decide what should be done to support the roof.

We have carefully considered the evidence and have concluded that the Company's proposal provides better provision for roof support of the areas affected by fire and water than the Commission's. Our conclusion is based upon the following considerations, not listed in order of their importance to our decision:

1. Representatives of the Federal Bureau of Mines performed torque tests of 10% of the bolts in entries 2, 4 and 6 of the 118 Road Section, made pull tests on seven bolts at different locations and made tensile strength tests on bolts taken from the mine. The inspector concluded: "The evaluation indicates that the roof bolts offer adequate roof support in most areas." The torque readings were submitted to the Commission but seemingly given little or no attention by it. The Bureau took over 400 readings. The Commission seems to have taken about 30, and many of these were within acceptable limits.

2. The Company also made about 400 torque tests, the vast majority of which were satisfactory.

3. The Company, as well as the Federal authorities, made tensile strength tests on bolts taken from the mine and these showed no deterioration. The Commission made no such tests but makes much in its report of the corrosive effect of fire, heat and water on the bolts. It concluded that "galvanic action" would also cause corrosion and weakening of the bolts. Its own expert agreed that galvanic action, if present, would be in such meager amount as to have no effect.

4. Eminently qualified professional engineers possessing baccalaureate and graduate degrees from the

University of West Virginia, Lehigh University, the University of Pittsburgh, Pennsylvania State University, and Ohio State University, who have spent an aggregate of scores of years in the bituminous coal mining industry, testified that the existing roof bolts provided safe support in many areas required by the Commission to be timbered or posted. The Department's sole expert was a native of India, who secured all of his education and training in that country or England, has been in this country only since 1969, is primarily engaged under a Federal grant in research on dust control and electricity in mining operations, and visits the Pittsburgh seam mines in company with students from Pennsylvania State University where he is employed as an assistant professor. The practice of roof bolting is not prevalent in either India or England and there is more than a faint indication that this witness disagrees with the Federal Bureau of Mines' and the Bureau of Deep Mine Safety of Department of Environmental Resources' approval of the practice in any case. He seems indeed to believe that roof bolts are not widely used in India and England because the safety of workers is accorded more importance there than in this country.[6] The Company's expert testimony preponderated overwhelmingly and we accept it as proof that the roof bolts in these areas of entries 2, 4 and 6, where the Company has proposed no additional support, are sufficient for the limited time and use of these entries intended by the Company.

5. The Company has no intention of using the 118 Road Section in mining operations. As we have found, it intends to use tracks in entry 4 and possibly entry 2

---

[6] The Company effectively rebutted this testimony by a witness with wide practical experience in both countries who declared that Indian miners lack the skill to place the bolts and that English mining methods are such as exclude the utility of roof bolting.

for the four months or so necessary to recover equipment and construct air stoppings and thereafter to use the area only as airways and escapeways for other areas of the mine. One of the Commissioners testified that the Commission in preparing its report believed that the Company intended to mine the section. Mining was admitted to be a more intensive use than that intended by the Company. Although the Commissioners on cross-examination testified that they would have made the same order if they had correctly understood the Company's proposal, some doubt, at least, is cast on its order by this basically incorrect assumption. We are not critical of the Commission in this regard since there is conflicting testimony as to whether the Company's plan was fully communicated to the Commission. The fact remains that the Commission's requirements were based on an assumption of mining rather than temporary use in the work of removing equipment and construction of stoppings and thereafter use only for ventilation and escapeways.

6. There are bad sections of roof at 12 and 13 crosscuts of entries 2, 3 and 4. When at argument it was pointed out that the Company would be greatly delayed in reaching and repairing these areas by the requirement of cross timbering, the Department's counsel suggested that we might modify the Commission's order to permit this work to be done, with the cross timbering of the intervening places to follow later. If the existing roof bolting is adequate support for this purpose, the Department's insistence that it must be supplemented by cross timbering for the short time necessary to remove machinery and equipment and construct stoppings is somewhat difficult to understand.

7. The mine is under constant surveillance, inspection and subject to immediate regulation in the interests of safety. As we have found, working areas are

inspected daily before workers enter them. A representative of the Federal Bureau is in the mine every day. The State inspector makes inspections at least quarterly and is on call, we understand, via a "hot line." The union's mine safety committee is immediately available. By contract with the Company, that committee can deny access to any area it deems unsafe until a determination can be made by inspectors. Finally, any workmen may similarly post any area he believes to be unsafe.

8. The areas of roof which are supported only by bolts in entries 2, 4 and 6 and which are the subject of this inquiry have stood since the fire in March 1971 and dewatering in September 1972 without falls or deterioration, except possibly for a small area showing deterioration in entry 6 between 8 and 10 crosscuts not shown on the Company's plan as needing additional support. Between September 1972 and March 1, 1973, the date of the Commission's order, many persons have traversed entries 2, 4 and 6 in the course of inspections and in the performance of rehabilitation work done before the mine inspector ordered cross timbering throughout. Since January 9, 1973, the date of the inspector's order, many persons, including mine foremen and superintendents, prospective witnesses, lawyers, inspectors and mine safety committees, have repeatedly visited the areas.

9. The area of most intense fire as observed in March 1971 is located 500 or 600 feet from the nearest point of entries 2 and 4, intended for temporary use as haulageways for men removing equipment and erecting stoppings. The face of the 118 Road Section is about 2000 feet distant from the area of intense fire in March 1971. Articles taken from the entries show no evidence of fire. Where there is evidence of fire, in entries 2 and 4 at crosscuts 10 through 14, the Company proposes to cross timber.

10. The Commission's report is not only erroneous in its appraisal of the effect of the fire and water on the bolts, as previously stated, its basic assertion that the effect of these elements on the roof structure cannot be determined by positive tests is demonstrably wrong. It concluded that the strength characteristics of the coal was destroyed by heat and water and that the layers of draw slate were so saturated with water that the strength of that body could not be evaluated except by visual observation. Details of these observations, however, are almost entirely lacking in the report. Where they are supplied they relate for the most part to areas the Company either has already or proposes to provide with added support. Obviously, torque tests, pull tests, stratascope observations, and tensile strength tests made by the Federal authorities and the Company and either supplied or made available to the Commission, are positive tests as to the safety of the roof. We quote from the report of the Bureau of Mines concerning its positive tests:

"....

"Nine roof bolts and bearing plates were removed from several different locations . . . to determine tensile strength of the roof bolts and make deflection tests on the bearing plates. . . .

"....

"The torque was checked on approximately 10 per cent of the roof bolts in the three entries. . . .

"....

"A stratascope was used to observe the strata in five of the holes from which the bolts had been removed and the strata appeared to be normal in all the holes.

"....

"Pull tests were made on seven roof bolts at different locations in the section to determine the anchorage strength of the strata.

" . . . .

"The evaluation indicates that the roof bolts offer adequate roof support in most areas." Hence, positive tests could be and were made, not only by the Bureau of Mines but by the Company. They cannot be brushed aside in favor of unrecorded visual observations.

In sum, the record clearly establishes by scientific testing, by a vast preponderance of expert professional opinion, and by demonstrative evidence that, as the Federal Bureau's inspector declares, "the roof bolts offer adequate support in most areas."

We cannot leave our discussion without referring to the Department's procedures in this matter. The superior of the mine inspector who originally ordered cross timbering throughout the section is the Department's Director of the Bureau of Deep Mine Safety. The inspector clearly and properly consulted with the Director before making his order. When this order was appealed the Secretary appointed as a commission three mine inspectors from other districts of Pennsylvania, again persons supervised by the Director. At the hearings in our court the Director was obviously the head of the lay group supporting the Department's case. Section 123, it seems to this writer, intends that the Commission appointed by the Secretary should make an independent judgment of the inspector's requirements. Without intending in any way to reflect adversely upon the integrity of the members of this Commission, we find it impossible to believe that these gentlemen could make a critical judgment of a fellow inspector's order concurred in by the head of the Bureau in which they were all employed. Surely there are professional engineers, knowledgeable lawyers, retired miners, retired operators and others in the State qualified to review an inspector's order and give a truly independent report. We note further that the Commission's report

was sent to the Secretary of the Department of Environmental Resources with the suggestion that it be forwarded to the Company, "If it meets with your approval." A commission report under Section 123 no more requires the Secretary's approbation than does an order of this court. Significantly, the Commission's report was held 15 days in the Department and then forwarded to the Company by the Director of the Bureau of Deep Mine Safety. This writer is haunted by the thought that if the Commission had been made up of persons connected with neither party, the judicial process would have been spared six or seven days of hearings, and a record which will, when finally transcribed, consist of more than a thousand pages and the parties saved an enormous expenditure of time and money.

We make the following:

ORDER

AND Now, to wit, this 7th day of June, 1973, it is Ordered that the Commission's report be and it hereby is set aside.

It is further Ordered that the Company's plan for additional roof support shown on its Exhibit 3 be and it is hereby approved and ordered to be effected; provided, however, that posting on four foot centers shall be provided in entry 6 between crosscuts 8 and 10; and provided further that our approval of the Company's plan for roof support in the extension of entry 4 from the intersection of entry 4 and crosscut 13 to bulkhead 15 is conditioned upon the taking of torque readings (if possible, by the Federal Bureau of Mines) of 10 per cent of the roof bolts in areas not proposed by the plan to be provided with supplementary support and if the results show that a majority of the roof bolts are not maintaining at least 70 per cent of the minimum torque required (50 per cent if plates bear against wood), or

have exceeded the maximum required torque by 50 per cent, supplementary support by posting on four foot centers shall be installed throughout the extension.

It is further ordered that if the Company proposes work in the 118 Road Mains Left Section, included within the fire and inundation area as delineated by Commissioner Muchnok on Exhibit P-2 but not indicated on Exhibit P-3, the bolts in such working areas shall be tested as hereinabove required for the extension of entry 4 to bulkhead 15 and subject to the same standard of adequacy and supplementary support.

The Prothonotary is directed to enter this Order and give notice thereof to the parties of record and their counsel forthwith. If no exceptions thereto are filed within thirty (30) days after notice hereof, a final order shall be entered as of course by the Prothonotary.

---

OPINION AND FINAL ORDER. PER CURIAM:

The Commonwealth has filed exceptions to the findings and conclusions of the opinion accompanying the order of ROGERS, J. made June 7, 1973. Thirty-eight exceptions are to findings of fact. While none of these have been formally withdrawn, only those relating to findings of fact numbered 32, 40 and 41 are pressed in the Commonwealth's brief or at argument. Therefore, as to the exceptions to all other findings, we need only state that we have reviewed the record and find support therein for each.

Our finding No. 32 was that the area of most intense fire was located about 500 or 600 feet from entries 2, 4 and 6 and 2000 feet from the facings of the 118 Road Section. This finding is supported by exhibits upon which the distances referred to may be ascertained by scaling. The Commonwealth's objection to this finding, expressed at argument, is that it implies that there were not fires in other places in the mine.

It seems to us that the reasonable implication of the finding is that there was fire at locations other than the place of "most intense fire."

The two remaining findings, the exceptions to which are pressed by the Commonwealth in brief and argument, are 40 and 41. Finding No. 40 is that the slate, shale, rooster coal and other materials *overlying the roof* were not *so affected* by fire or water as to increase the danger of falls. This finding, the Commonwealth asserts, is inconsistent with the admitted fact that there were falls following the fire and flooding. The roof of the entries consists of coal about one foot in thickness. The shale and other materials referred to in finding No. 40 are *above* this roof of coal. The finding is not that the roof of coal was not affected but only that the overlying materials were not so affected, except, of course, where the roof collapsed and the materials came down. Stratascope readings in the record clearly support this finding.

Finding No. 41 is as follows: "The Company's plan provides adequate additional roof support in those areas of entries 2, 4 and 6 where by reason of fire the roof has fallen or otherwise been affected." The Commonwealth contends that this finding is erroneous in view of undisputed testimony that there are places in the 118 Road Section where there is evidence of bad roof which are not proposed to be supplied with additional support by the company's plan as *solely indicated* by Exhibit P-3. P-3 is a map of the mine on which the company has indicated areas where it has already supplied additional support and where it proposes to supply additional support. The Commonwealth insists that Exhibit P-3 is the company's plan or proposal of roof support in its entirety. However, the company's plan, in the sense of a proposal, as repeatedly testified to by its witnesses, is that it will certainly provide the

additional support shown on Exhibit P-3 and that it will provide additional support in other areas which may, as time goes on, need it. Indeed it would be required by State and Federal law and regulation to do so.

At argument the Commonwealth referred to three areas, one each in entry 4, entry 2 and entry 6, where additional support was assertedly needed but not shown on Exhibit P-3. The deteriorated area in entry 4 was alleged at argument to be between crosscuts 10 and 11. We have examined the record at page 431 and have ascertained that the *admitted* fault referred to at that place was at crosscuts 3 and 4, at which location Exhibit P-3 shows cross-timbering has already been accomplished. Our examination of the record discloses no location in entry No. 2 which is admittedly deteriorated and not proposed to receive supplemental support. Indeed, the company proposes to give additional support for all but a small portion of that entry.

As Judge ROGERS mentions in the opinion, all of the notes of testimony had not been transcribed at the time his order was required to be made by the statute. Among the notes not so transcribed were those of the testimony of William Hanley, the assistant mine superintendent, commencing at page 1041. There Mr. Hanley on direct examination stated that there were places in the No. 6 entry where needed supplementary support must and would be supplied not so shown on Exhibit P-3. These areas are between crosscuts 10 and 11, and between crosscuts 8 and 9. Judge ROGERS' nisi order directs posting between crosscuts 8 and 11. Our final order will direct posting in accordance with the record between 8 and 9 and 10 and 11.

The company's plan, in the sense of a proposal, includes additional supports at any area of the 118 Road Section which subsequently proves to need it. There-

fore our order herein obviously means and will mean that the approval of the company's plan includes not only the additional support shown thereon, and the additional support in entry No. 6 not shown thereon but agreed to be supplied between crosscuts 8 and 9 and 10 and 11, but also any additional support which changing conditions shall indicate. Supplementary support would in any event be required under the approved roof plan for the mine and, as we have noted, the mine is subject to daily inspection and instantaneous order for support where needed.

The Commonwealth has also taken serious exception to that portion of Judge ROGERS' opinion as suggests that the makeup of the commission might have been other than that of other mine inspectors. The Commonwealth reads the Pennsylvania Bituminous Coal Mine Act to require that all commissions should consist of mine inspectors and points to the definition of "investigating commission" at Section 103(16), 52 P.S. §701-103(16). However, an investigating commission is by the same section described as being "for the purpose of investigating and reporting on any problem." Further, Section 124, 52 P.S. §701-124, empowers the secretary to appoint a commission "for the purpose of investigating any question . . . to enable him to make a decision . . . ." The commission contemplated by Section 123, 52 P.S. §701-123, is not one which investigates in order to enable the secretary to make a decision. The commission makes the decision. It is, therefore, arguable that a Section 123 committee need not be composed entirely of mine inspectors. Nevertheless, the practice appears to have been in Section 123 cases always to appoint mine inspectors, and administrative interpretations of statutes as evidenced by long standing practice are entitled to weight. P.L.E., Statutes, Vol. 34, §155. In any event, Judge ROGERS' references

to this subject matter were *obiter dicta*. Our review of the complete record convinces us, regardless of the composition of the commission, that the record overwhelmingly supports the conclusion that this commission's order should not stand.

Finally, the Commonwealth excepts to that portion of Judge Rogers' order regarding the taking of torque tests in areas in which the commission never traveled, and as to which there is very little testimony as to actual conditions. The Commonwealth argues that the order should have required that supplementary support should be provided wherever a majority of the readings exceeded the maximum torque of 240 or a minimum of 100 or 70 pounds, the latter two depending upon the presence or absence of wooden header blocks, these being the standards for the installation of bolts by the approved plan and state regulations. Judge Rogers' order requiring supplementary support only if a majority of bolts are not maintaining at least 70% of the required minimum torque (50% if plates bear on wood) or exceeding the maximum by 50% is based upon Federal standards applicable in this situation. The order's requirement is a precondition to any use of the areas and is in addition to all other requirements, including the inspections, hereinbefore mentioned, and the continued strict application of the company's approved roof plan. It is not the establishment of a new plan but the imposition of a safety requirement in addition to all others and one not a part of the company's proposal otherwise approved. We are not impelled to change the order in this respect.

We therefore make the following:

### FINAL ORDER

And now this 9th day of August 1973, it is Ordered that the Commonwealth's exceptions to the order of

40

June 7, 1973 be and they are dismissed and the Commission's report be and it is set aside.

It is further Ordered that the Company's plan for additional roof support shown on its Exhibit 3 be and it is hereby approved and ordered to be effected; provided, however, that posting on four foot centers shall be provided in entry 6 between crosscuts 8 and 9 and 10 and 11; and provided further that our approval of the Company's plan for roof support in the attention of entry 4 from the intersection of entry 4 and crosscut 13 to bulkhead 15 is conditioned upon the taking of torque readings (if possible, by the Federal Bureau of Mines) of 10 per cent of the roof bolts in areas not proposed by the plan to be provided with supplementary support and if the results show that a majority of the roof bolts are not maintaining at least 70 per cent of the minimum torque required (50 per cent if plates bear against wood), or have exceeded the maximum required torque by 50 per cent, supplementary support by posting on four foot centers shall be installed throughout the extension.

It is further ordered that if the Company proposes work in the 118 Road Mains Left Section, included within the fire and inundation area as delineated by Commissioner Muchnok on Exhibit P-2 but not indicated on Exhibit P-3, the bolts in such working areas shall be tested as hereinabove required for the extension of entry 4 to bulkhead 15 and subject to the same standard of adequacy and supplementary support.