## Matter of West Penn Power Company

*Lawrence A. Demase,* of *Rose, Schmidt & Dixon,* for appellant.
*Robert Yuhnke,* for Commonwealth.

PAUL E. WATERS, *Chairman,* September 17, 1975—This case is an appeal by West Penn Power Company ("West Penn") from the denial by the Department of Environmental Resources ("department") of an application, no. 1472205, for an industrial waste permit for the discharge of cooling

water from West Penn's Milesburg Power Station to Spring Creek, in Milesburg, Centre County, Pa. The denial was based on the ground that the discharge would result in a violation of the water quality criteria contained in chapter 93 of the regulations of the department, specifically, and only, as those water criteria related to temperature.

At issue are the interpretations of chapter 93 of the regulations read in conjunction with sections 97.81, 97.82, 97.83, and 97.85 of the Regulations (25 Pa. Code Chap. 93 and §§97.81, 97.82, 97.83 and 97.85) and with sections 4 and 5 of The Clean Streams Law of June 22, 1937, P.L. 1987, art 1, sec. 4 and sec. 5, as amended, 35 P.S. §§691.4 and 691.5, and article I, sec. 27, of the Constitution of Pennsylvania. There were 12 days of hearings held before Robert Broughton, who was chairman of the board when the hearings started, and who continued as a hearing examiner for the final six days of hearings. A proposed adjudication, including findings of fact, was submitted by Hearing Examiner Broughton to the board. It is being adopted with some modifications.

## FINDINGS OF FACT

The following findings incorporate the 18 numbered paragraphs of the stipulation entered into between the parties on November 1, 1974. The parties also stipulated the admission of a number of exhibits without objection as to authenticity, and without waiving the right to question the credibility of the documents or raise other objections. These were given EHB exhibit numbers.

1. West Penn Power Company is a Pennsylvania corporation and a public utility which has operated the Milesburg Power Station, an electric power

generating facility located in the Borough of Milesburg in Centre County, since the year 1950.

2. West Penn's operation of the Milesburg Power Station has always been conducted pursuant to authority granted to it according to the provisions of the Pennsylvania Public Utility Law.

3. The Milesburg Power Station discharge which is the subject of this proceeding is located approximately 800 feet upstream from the confluence of Spring Creek and Bald Eagle Creek along the west bank of Spring Creek.

4. A dam is located approximately 400 feet above the discharge on Spring Creek.

5. The dam on Spring Creek near the Milesburg Power Station is over 45 years old and was acquired by West Penn in 1929.

6. Steam coming from the turbines at the Milesburg Power Station is cooled in two condensers. Water is taken from Spring Creek above the dam at a constant rate of 15,000 gallons per minute, per unit for each of two units and circulated through to cool the condensers of the electric generating units. The water is then discharged into Spring Creek approximately 400 feet below the dam.

7. The only issue in this case revolves around the thermal component of the Milesburg Power Station discharge.

8. Spring Creek is supplied by ground water sources originating in limestone beds in the Nittany Valley. In the vicinity of the Milesburg Power Station it has an average water depth of one to three feet over a flat bottom of small rubble and is approximately 73 feet wide.

9. Bald Eagle Creek is fed basically by surface runoff. It has an average depth of two feet, but is slower-moving than Spring Creek.

10. On March 23, 1972, the Commonwealth and

West Penn entered into an agreement wherein it was stipulated that West Penn would submit two applications and supporting data for a single permit to discharge condenser cooling water into Spring and Bald Eagle Creeks. One application, no. 1472205, from the denial of which this appeal was taken, would provide for no treatment; the other, no. 1472204, would provide for predischarge cooling.

11. On December 22, 1972, West Penn submitted modules numbered 2, 4 and 27 of the Sanitary Water Board's permit application form for industrial wastes, application no. 1472205.

12. On March 8, 1973, West Penn submitted a pollution incident prevention plan for the Milesburg Power Station discharge as part of its application no. 1472205 for a sanitary water board permit. Also, on March 8, 1973, modifications to module 27-1 and an additional module page 27-1a were submitted.

13. The above-mentioned March 8, 1973, modifications submitted by West Penn altered sheet 27-1 at the insistence of the department to indicate in further response to the answers given regarding whether Spring Creek was "suitable for trout." However, West Penn further qualified the above alteration in additional sheet 27-1a and stated as follows:

"Spring Creek is presently classified as a trout stream by the Pennsylvania Department of Environmental Resources. However, recent aquatic impact studies immediately upstream from the power plant indicate that the average temperature of the stream at this location is 64°F. This stream average is well above the 58°F. temperature limit considered suitable for trout although indigenous

trout may survive in this environment on a short term basis. It is therefore concluded that although Spring Creek is presently classified as a trout stream, the lower reaches of the stream near the confluence of Spring and Bald Eagle Creek may not be a completely 'suitable' environment for trout."

14. During the period the department was reviewing West Penn's application no. 1472205 for approval to continue its untreated discharge from the Milesburg Power Station, the highest designated use of Bald Eagle Creek between Laurel Run and Nittany Creek (which includes the area at and below Spring Creek's confluence with Bald Eagle Creek) was a "cold water fishery."

15. Effective May 12, 1974, the Environmental Quality Board changed the highest designated use of Bald Eagle Creek, from Laurel Run to Nittany Creek, from a "cold water fishery" to "trout stocking" (i.e., naturally capable of supporting trout stocking but not trout reproduction). This new classification is consistent with facts contained in the Milesburg Aquatic Impact Study.

16. By letter dated May 2, 1973, Ernest Giovanitti of the Department informed West Penn of the denial of its application no. 1472205 for a permit to discharge untreated water. It is from this denial that the present appeal is being taken.

17. In July of 1971, Howard Swartz, executive vice president of West Penn Power Company, received a violation notice directed to West Penn Power's Milesburg Power Station. This violation notice was from the Department of Environmental Resources, Commonwealth of Pennsylvania, signed by Charles Williams, Jr., Chief of the Administration and Enforcement Section of the Pennsylvania Bureau of Sanitary Engineering.

18. West Penn has submitted an application to the United States Environmental Protection Agency (hereinafter "EPA") for a National Pollutant Discharge Elimination System (hereinafter NPDES) permit.

19. Pennsylvania has applied to the EPA for authority to administer the NPDES program in the Commonwealth.

20. The Milesburg Power Station has a full load capability of 46 megawatts net output, and, until the conversion to no. 2 fuel oil in late 1973, was fueled by coal.

21. The Milesburg Power Station is predominantly a peaking facility, but it is also utilized when considerations of service require such utilization of power in its service area.

22. The only matter at issue in the denial of a permit to discharge untreated water from the Milesburg Power Station is the thermal component of the discharge.

23. There is no practical way of cooling the condensers at the Milesburg Station without discharging some water and even with a cooling tower, the Milesburg Power Station would, periodically and during certain times of the year, discharge warm water into Spring Creek.

24. The cost, estimated at the time of the hearing, to install a cooling tower at the Milesburg Power Station, of the type mentioned in the permit for a treated discharge approved by the department would be $936,000.

25. The annual operating costs, estimated at the time of the hearing, for the cooling tower approved by the department for the Milesburg Power Station would be $474,000.

26. A wet cooling tower has an environmental

impact of emitting water into the air which can result in increased fogging, hazing and icing. It may also increase the concentration of dissolved solids in Spring and Bald Eagle Creeks.

27. In approving West Penn's application for a permit to discharge treated water and to build a wet cooling tower at the Milesburg Power Station, as well as in denying the permit application at issue here, the department has knowledge that the cooling tower which was proposed might have adverse environmental impacts within the vicinity of the Milesburg Station. What consideration, if any, was given this knowledge is not known.

28. The temperature of Spring Creek has been taken regularly at the Milesburg Power Station and has been recorded on log sheets since the year 1950. The temperature of the discharge water of the Milesburg Power Station has also been regularly taken for over eight years.

29. The ambient temperature of Spring Creek above the discharge rises in some years to 72°F in the summertime.

30. The temperature of Spring Creek at Axeman (located approximately four to five miles upstream from Milesburg), as measured by the United States Geological Survey measuring station, consistently exceeds 58°F during the months of May, June, July, August and September.

31. Both the Director of the Bureau of Fisheries and Engineering and the Chief of the Fisheries Management Section were of the opinion that for purposes of evaluating the cooling tower alternative, it was "not realistic" to insist upon a strict 58°F discharge in Spring Creek from the Milesburg Power Station to the confluence of Spring and Bald Eagle Creeks. This opinion was transmitted to the

Chief of the Division of Quality Control of the Department.

32. The mixed temperature of Bald Eagle Creek below the confluence of Spring and Bald Eagle Creeks is cooler, during the period between October and December, than the ambient temperature of Spring Creek.

33. At all times of the year, the natural temperature of Bald Eagle Creek below the confluence of Spring and Bald Eagle Creek is cooler than the existing ambient temperature in either one of the streams above the confluence.

34. During the critical months for temperature on Spring Creek of July and August, a passage zone for cold water fish exists which is approximately 50 percent of stream width.

35. During the months of September and October, when the highest mixed temperatures below the confluence of Bald Eagle and Spring Creeks exist, a fish passage zone of approximately 50 percent of river width exists.

36. The longitudinal extent of the Milesburg thermal plume is contained within the natural mixing zone of Spring and Bald Eagle Creeks.

37. The dynamics of the physical properties of any two rivers joining at a confluence are in a high state of flux, and, generally, the confluence area has a diversity different and, in most cases, higher than either of the two streams joining at the confluence.

38. For all months of the year except March, the mean flow of Spring Creek is larger than that of Bald Eagle Creek just above the confluence. During March, Bald Eagle Creek's flow is larger than Spring Creek. The low flow for Spring Creek, based on a four-year (1967-70) average, occurs during

September. The combined flow for Spring and Bald Eagle Creeks has a low flow that occurs during October.

39. The ambient temperatures of lower Spring Creek naturally exceed 58°F consistently during the months of June, July, August and September.

40. Temperature requirements for freshwater fish vary during the year dependent upon particular biological functions (spawning, incubation, growth, etc.). Lethal temperatures for trout and other fish are dependent upon the temperature to which the fish were acclimated before exposure to the lethal temperature. These lethal temperatures are also dependent upon the length of exposure.

41. Brown trout begin their main spawning runs in the fall when the water temperature falls to about 44-48°F. Spawning will occasionally occur over a wider temperature range but would be reduced at higher and lower temperatures. Egg incubation times vary from 148 days at 35.5°F to 35 days at 52°F with hatching success being reduced at higher temperatures. Hatching will occasionally occur at 58-60°F and the variation probably depends on the particular race of the species. Water temperature is the main external environmental factor influencing growth rate; maximum growth rate was achieved at 54°F. As indicated, the lethal temperature for brown trout is dependent upon the acclimation temperatures; also, young fish generally have a greater heat tolerance than do the adults. Fifty percent of brown trout alevins died at 73.4°F during a seven day exposure after acclimation at 68°F, although some fish can endure temperatures up to 77-80°F for short periods.

42. Brook trout also spawn in the fall at mean daily water temperatures between 40-50°F. Opti-

mal hatching occurred at 43°F with a 50 percent reduction at 55°F. Incubation time varied from 144 days at 35°F to 35 days at 55°F. Optimal growth for larvae was 54-59°F and for adult brook trout was 61°F. Growth rates are reduced at higher temperatures. Fifty percent of adult brook trout acclimated at 52, 68 and 75-77°F, died at temperatures between 77-78°F. Some fish could survive higher temperatures for short periods of time (a few hours).

43. Fish will avoid — swim away from — areas where they find temperatures which they do not like; hence, fish are seldom killed by temperature changes under field (as distinguished from laboratory) conditions.

44. Spring Creek, in the area of the Milesburg discharge, will naturally support warm water fish as well as members of the family Salmonidae.

45. In order to ascertain the effect, if any, of the discharge from the Milesburg Power Station, West Penn had the Westinghouse Environmental Systems Department conduct two studies. The first of these was conducted from March through December of 1972. The second of these was referred to throughout the hearings as the "Milesburg Seasonal Aquatic Impact Study."

46. The area of Spring Creek that was designated as Zone No. 1 in the Milesburg Seasonal Aquatic Impact Study, which was above the dam upstream from the Milesburg Power Station, and, therefore, above any possible temperature influence of the power station, is a marginal trout stream.

47. The ambient temperature for Spring Creek upstream from any possible temperature influence of the Milesburg Power Station as determined from

the Milesburg Seasonal Aquatic Impact Study and from records of the temperature of the intake water, during spawning season for brook trout and rainbow trout, exceeds the optimum spawning temperature of these respective species.

48. The calculated mixed temperatures of Bald Eagle Creek downstream from the Milesburg Power Station when the power plant is not operating, exceed the maximum weekly average temperature for spawning necessary for brook and rainbow trout.

49. The maximum weekly average temperature for brook trout spawning is exceeded in Bald Eagle Creek during that species' spawning season; and during the early part of that spawning season, the short-term maximum temperature for brook trout embryo survival is also exceeded.

50. The maximum weekly average temperature for rainbow trout spawning is exceeded during the latter part of the spawning season in Bald Eagle Creek; toward the latter part of that spawning season, the maximum weekly average for spawning activity is exceeded; and during a period of the spawning season the short-term maximum temperature for embryo survival is exceeded.

51. The temperature range for brown trout spawning is exceeded during part of the spawning season by the natural temperature of Bald Eagle Creek, and the preferred temperature of brown trout is exceeded during most of the summer months in Bald Eagle Creek.

52. The calculated mixed temperatures of Bald Eagle Creek below the confluence with Spring Creek, when the power plant is not operating, are such that this section of Bald Eagle Creek cannot naturally sustain a cold water fishery.

53. The calculated mixed temperature of Bald Eagle Creek below its confluence with Spring Creek with the Milesburg Power Station operation at full load, does not exceed the upper limit for survival of rainbow trout.

54. The calculated mixed temperature of Bald Eagle Creek below its confluence with Spring Creek, with the Milesburg Power Station operating at full load with a maximum heat output, does not exceed the upper limit for survival of brown trout.

55. The calculated mixed temperature of Bald Eagle Creek below its confluence with Spring Creek, with the power plant operating at a maximum, and a discharge temperature 18°F above the inlet temperature, does not affect the use of Bald Eagle Creek as a trout stocking stream.

56. The temperature of the discharge from the Milesburg Power Station, without mixing and at full output, causing a temperature difference between inlet and outlet of 18°F, exceeds the weekly average temperature for maximum growth of the white sucker only during the summer and by only a few degrees for a short period of time.

57. Under the usual operating conditions existing at the Milesburg Power Station, white sucker could live and grow in portions of the thermal plume.

58. Based upon temperature considerations alone, small mouth bass would live and grow well in all portions of the thermal plume during the summer months.

59. The maximum discharge temperature does not exceed the maximum weekly average temperature for spawning of the blue gill sunfish during approximately the first half of the blue gill sunfish spawning season.

60. The upper temperature limit for growth of the blue gill sunfish is not exceeded by the maximum discharge temperature of the Milesburg Power Station.

61. A study by the Commonwealth of fish and benthic communities in August and September 1973, indicates that the east portion of Spring Creek opposite from and below the discharge supports a biological community with the species composition of a reasonably normal cold water fishery. The west portion, within the influence of the heated discharge, has a species composition representative of a reasonably healthy warm water fishery.

62. The biological data collected by Westinghouse Environmental Systems Department at Milesburg during 1972, as well as by the department in 1971 and 1973, indicated that, while there may be effects on aquatic biota which are attributable to the Milesburg Power Station discharge, such effects are restricted to the thermal plume within the mixing zone, are limited to warmer summer months and do not threaten or disrupt the balance or stability of the ecosystem of Spring Creek or Bald Eagle Creek.

63. In order to determine the effect of any discharge on the stream into which such discharge is made, the aquatic populations, as well as all physical and chemical parameters of the stream must be studied on a case-by-case basis.

64. The Milesburg Power Station discharge does not interfere with present, and does not interfere significantly with possible future, uses of Spring Creek.

65. In the permit granted to discharge treated wastes (application no. 1472204) from the Milesburg Power Station, the department, on its own

initiative, stated that West Penn could take water from Spring Creek and discharge it into Bald Eagle Creek.

66. In passing on the applications for West Penn's Milesburg Power Station, the department only looked at the temperature criteria for Spring Creek contained in chapter 93 of the Pennsylvania Code, and considered a 58°F maximum temperature and a maximum 5°F rise above ambient stream temperature, assuming complete mixing and assuming the stream was at critical low flow.

67. In passing on West Penn's application for an untreated discharge, the department made no evaluation of the actual impact of the Milesburg discharge and made no evaluation of the alleged effects of the discharge on the uses of the receiving stream.

68. In rejecting West Penn's application for a permit to discharge untreated water from the Milesburg Power Station, the department in E. Giovanitti's letter of May 2, 1973, to West Penn Power Company, stated that the rejection was for failure to meet applicable temperature criteria.

69. When applying the temperature regulations of the department, and deciding whether to select a mixing zone, and defining such mixing zones, it is of critical importance to take into account any confluence or other conditions which may be present in the area downstream.

70. The department did not apply a mixing zone in passing on West Penn's application for an untreated discharge, but did apply a mixing zone in granting West Penn's application for a treated discharge, despite the fact that under the department's interpretation the water quality criteria of 25 Pa. Code Chapter 93, supra, and the strict re-

quirements of §97.82(a) (25 Pa. Code §97.82(a)), would not be met under the department's interpretation.

71. Natural mixing zones occur in nature, when streams with different characteristics merge.

72. Heat in discharges as an environmental factor, unlike many other components of discharges, dissipates and does not have extensive or cumulative downstream effects.

73. The Sunbury Station of Pennsylvania Power & Light was allowed a mixing zone within which compliance with the temperature water quality criteria of chapter 93 was not had.

74. Dissolved oxygen levels in an aquatic environment are good indicators of the health of the aquatic ecosystem with a higher level of dissolved oxygen being more favorable to health, maintenance and strength of an aquatic community. The dissolved oxygen concentration in Spring and Bald Eagle Creeks are at or near saturation.

75. There is no synergism between the thermal discharge associated with the Milesburg Power Station and nutrients.

76. A diatom dominated stream is generally considered by aquatic biologists to be a healthier stream than a stream dominated by blue-green algae, and the diatom dominates the periphyton community in Spring and Bald Eagle Creeks, albeit less dominantly within the heated discharge than in other portions of those creeks.

77. The Westinghouse Environmental Systems Department made an evaluation of the seasonal impact on the benthic community which was based upon a benthic diversity index (at a family level) in each of the study zones. The results of these studies and evaluations show that there was no statisti-

cally significant difference in the benthic diversity between study zones due to the Milesburg Power Station thermal effluent. The only effects shown were between the heated area and other areas.

78. The zonal analysis of the benthic diversity index showed that the benthic diversities within the heated study zones were not statistically different from the diversities within the control zone, thereby indicating a balanced, stable ecosystem.

79. Because fish represent the highest trophic level in most aquatic ecosystems, they hold a conspicuous position in being indicators of the general condition of the ecosystem.

80. Environmental stresses, including the effect of a thermal discharge, which may affect lower trophic levels such as benthos and periphyton, eventually may be reflected in the fish population structure.

81. The analyses of the fish data concerning fish composition, biomass, diversity index and condition factor for the dominant species revealed that the fish communities in the heated zones are either not significantly different from other study zones or that heated zones are better from a statistical viewpoint.

82. A species diversity index is a measure of the number of different species and the number of different organisms in each species. A species diversity index both defines a particular environment and indicates the health of that species diversity index is in the best measure of the strength and stability of an ecosystem.

83. The department at one time concluded that the thermal discharge from the Milesburg Power Station was having no adverse impact on the

benthic macroinvertibrate population of Spring Creek.

84. The 1973 survey by the department failed to examine many of the parameters which the department witnesses stated were important and which were studied by Westinghouse Environmental Systems Department.

85. The 1971 aquatic survey done by the department was only a general survey of the entire Spring Creek — Logan Branch Spring Creek watershed.

86. The aquatic ecosystem of Spring Creek in the area of the Milesburg Power Station discharge, taken as a whole, is not adversely affected by the Milesburg discharge. A portion of the lower 800 feet of Spring Creek is changed by the discharge from a cold water to a warm water fishery.

87. A stable, balanced, indigenous, aquatic ecosystem is being maintained in both Bald Eagle Creek and in Spring Creek in the area of the Milesburg discharge.

88. The Milesburg discharge does not interfere with the use of either Bald Eagle or Spring Creeks as trout stocking streams.

89. In failing to allow a mixing zone to West Penn's Milesburg discharge, and in denying the permit, the department failed to consider the factors listed in section 5 of The Clean Streams law, supra.

90. The department failed to consider the adverse environmental effects of its approved alternate method of control (a cooling tower) in denying West Penn's application for a permit to discharge untreated condenser cooling water.

91. In rejecting West Penn's application for a

permit to discharge untreated water and in approving the application to discharge treated water, the department failed to adequately consider the relative economic burdens of such treatment in light of the level of environmental effect involved.

## DISCUSSION

This case involves an apparent conflict between the water quality criteria for Spring Creek,[1] specified in section 93.6(b)(5), Table 9 (04.137.24) of the regulations of the department, as those water quality criteria apply to temperature,[2] and section 97.82(a) of the regulation and the language of sec-

1. When the case was originally filed, the same water quality criteria applied to Bald Eagle Creek. While the case was pending, the water quality criteria for Bald Eagle Creek were changed, so the conflict referred to now applies severely only to the lower 800 feet of Spring Creek.

2. The water quality criteria for Spring Creek, designated as a cold water fishery are at present as follows, 25 Pa. Code §93.5(c), (Table 3):

"d Temperature.

"$d_1$ Not more than a 5°F. rise above ambient temperatures, that is the temperature of the water body upstream of a heated waste discharge or waste discharge complex. The ambient temperature sampling point should be unaffected by any sources of waste heat; not to be increased by heated waste discharges to temperatures in excess of 58°F., not to be changed by more than 2°F. during any one-hour period."

(This language was changed during the pendency of this litigation. We apply the currently applicable language. If a difference in result involving the exercise of the discretionary expertise of the department arises, we will deal with that situation then. It does not in this case.)

The present water quality criteria for Bald Eagle Creek, designated as trout stocking waters, is as follows, 25 Pa. Code §93.5(c), (Table 3):

"d Temperature . . .

"$d_6$ For the period February 15 to July 31 not more than

tions 97.81, 97.82(b), 97.83 and 97.85[3] of the same

5°F. rise above ambient temperature or a maximum of 74°F., whichever is less, not to be changed by more than 2°F. during any one hour period; for the remainder of the year not more than a 5°F. rise above ambient temperature or a maximum of 87°F., whichever is less, not to be changed by more than 2°F. during any one-hour period."

3. These sections 97.81, 97.82, 97.83 and 97.85, 25 Pa. Code §§97.81, 97.82, 97.83 and 97.85, read as follows:

"§97.81 Prohibition.

"The temperature of the waters of this Commonwealth shall not be increased artificially in amounts which shall be inimical or injurious to the public health or to animal or aquatic life or prevent the use of water for domestic, industrial or recreational purposes, or stimulate the production of aquatic plants or animals to the point where they interfere with these uses.

"§97.82 Allowable discharges.

"(a) The heat content of discharges shall be limited to an amount which would not raise the temperature of the entire stream at the point of discharge 5°F. above ambient temperature or a maximum of 87°F., whichever is less, nor change the temperature by more than 2°F. during any one-hour period, assuming complete mixing, but the heat content of discharges may be increased or further limited where local conditions would be benefited thereby.

"(b) Where downstream circumstances warrant, the specific area in which the temperature may be artificially raised above 87°F. or greater than 5°F. above ambient temperature or by more than 2°F. during any one-hour period shall be prescribed.

"§97.83 Fishways.

"A fishway shall be required in streams receiving heated discharges where it is essential for the preservation of migratory pathways of game fish, or for the preservation of important aquatic life. The dimensions of the fishway shall be prescribed in each case, dependent upon the physical characteristics of individual streams whenever necessary.

". . .

"§97.85 Trout streams.

"There shall be no new discharge to waters providing a suitable environment for trout if as a result the temperature of the receiving stream would be by more than 5°F. above natural temperatures or be increased above 58°F."

regulations. It also involves a dispute as to the scope of the department's responsibilities under those regulations, as affected by sections 4 and 5 of The Clean Streams Law,[4] supra, and article I, sec. 27, of the Constitution of Pennsylvania.[5]

4. Sections 4 and 5 of The Clean Streams Law provide, in relevant part, as follows:

"§691.4 Declaration of policy.

"(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

"(2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

"(3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

"(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

"(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control.

"§691.5 Powers and duties.

"(a) The board and the department, in adopting rules and regulations, in establishing policy and priorities, in issuing orders or permits, and in taking any other action pursuant to this act, shall, in the exercise of sound judgment and discretion, and for the purpose of implementing the declaration of policy set forth in section 4 of this act, consider, where applicable, the following:

"(1) Water quality management and pollution control in the watershed as a whole;

"(2) The present and possible future uses of particular waters;

"(3) The feasibility of combined or joint treatment facilities;

"(4) The state of scientific and technological knowledge;

"(5) The immediate and long-range economic impact upon the Commonwealth and its citizens."

5. Article I, sec. 27, of the Constitution of Pennsylvania provides as follows:

Interestingly, the case does not involve significant dispute as to the basic underlying facts, although there is considerable disagreement between the parties as to the interpretation and legal significance of those facts. Both parties agree that, assuming complete mixing at the point of discharge, there would be, at full power plant load and minimum stream flow, a theoretical stream temperature change of almost 9°F. Therefore, the strict requirements of section 97.82(a) are not met. In reality, however, complete mixing does not occur at the point of discharge and, by the time complete mixing does occur, the heated water has been exposed to the natural environment for some period of time, and some cooling will have taken place.[6]

Unlike Regulation section 97.82(a), the water quality criteria do not refer to "the point of discharge" as the point at which the stream temperature may not be raised above the applicable limits. Hence, the water quality criteria do not preclude the allowance of a reasonable mixing zone if there is no significant effect on the ambient temperature of the stream outside such a mixing zone. The department's initial analysis, which assumed the

---

"Natural resources and the public estate.

"Section 27. The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people."

6. In this respect, heat, as a pollutant, is unlike chemical pollutants. The latter may become diluted as they are carried downstream, but do not disappear or dissipate. Many even build up and become concentrated in the organisms and food chains at the aquatic ecosystem. Heat not only is diluted; it dissipates.

same theoretical calculation was applicable under both chapter 93 and regulation section 97.82(a) (25 Pa. Code Chapter 93 and §97.82(a)), was, therefore, legally in error. That does not resolve the case, however. The thermal plume of the plant itself ranges as high as 19.5°F.[7] above the intake temperature, and amounts of 41 percent of the flow of Spring Creek. Pending complete mixing, stream temperatures within the plume are therefore raised considerably more than 5°F. This is not contested. Nor is it contested that there are significant effects on the aquatic ecosystem within the area occupied by the thermal plume in Spring Creek.[8] West Penn argues that these significant effects are limited to the area at the plume — approximately one half the width of the lower 800 feet of Spring Creek — and that the effects on the aquatic ecosystem of Spring Creek as a whole are insignificant.

The department argues first that since the literal language of regulation section 97.82(a), supra, is violated, nothing else matters. Second, it argues that even if something else matters, any effect in any portion of the stream is a significant effect. See, e.g., the recommendations made in the department's two studies of lower Spring Creek, Commonwealth Exhibits Nos. 1 and 12.

The legal argument thus turns on the issue of whether a "mixing zone," or area within which temperatures may be allowed to increase more than the strict numerical requirements of chapter 93 and regulation section 97.82(a), supra, may (or more accurately in the context of this case, must)

---

7. 19.5°F. is actually the maximum design temperature change of the power plant. 18.4°F. is the highest temperature change noted in the record.

8. See Findings, supra.

be allowed. The department on this issue argues that chapter 93 and section 97.82(a), supra, effectively preclude any mixing zone. West Penn argues that chapter 93 and regulations sections 97.81, 97.82(a) and (b), 97.83, and 97.85, supra, must be read together, and must be read also in light of section 5 of The Clean Streams Law, supra. West Penn argues that, so read, the regulations require that the department define and approve some reasonable mixing zone, at least "if downstream circumstances warrant."

On this issue, we must hold that West Penn is correct. Regulations sections 97.82(b) and 97.83 purport to modify the requirements of at least section 97.82(a). And, as we have indicated, we do not believe that the requirements of Chapter 93 preclude the allowance of a reasonable mixing zone. To the extent these provisions are in apparent, but not irreconcilable conflict,[9] then section 5 of The

---

9. The conflict between Chapter 93 and section 97.85 does, indeed, appear to be irreconcilable. The former limits all discharges, the latter only "new" discharges. See notes 2 and 3, supra. In relation to the enactment dates of either provision (whether we take the original dates of enactment by the Sanitary Water Board, in the middle 1960's, or the reenactment date, by the Environmental Quality Board in 1 Pa. Bull. 1804 (1971) the discharge in question is clearly an "old" discharge, the Milesburg Power Station having been operated by West Penn since 1950. Arguably the application of section 97.85 to new discharges only is related to the fact that The Clean Streams Law at the time of section 97.85's original proposal (before the 1965 Clean Streams Law amendments) was geared to keeping existing clean streams clean, not reclaiming polluted streams. The 1962 Report of the Division of Sanitary Engineering, "Heated Discharges . . . Their Effect on Streams" (EHB Exh. 19), which contains the recommendation for that provision, however, places the emphasis on the then limited nature of the environmental impact, and on what the

Clean Streams Law, supra, especially sections 5(a)(1), 5(a)(2), would seem to require the more flexible interpretation.[10] And, indeed, since the Regulations, read as a whole, give the Department discretion, "where downstream circumstances warrant," to define a mixing zone, general principles of administrative law would seem to require the Department to exercize that discretion, and section 5 of The Clean Streams Law[11] requires that

Division regarded as unjustifiable costs of requiring treatment of existing discharges. The relative dates of enactment of Chapter 93 and sections 97.81, 97.82, 97.83, and 97.85 do not especially help us in deciding which sections are applicable to this case, even with reference by analogy to sections 81 and 66 of the Statutory Construction Act, Act of May 28, 1937, P.L. 1019, as amended, 46 P.S. §§581 and 566, since the wholesale reenactment by the Environmental Quality Board in 1 Pa. Bull. 1804 (1971) prompts at least a question as to whether that Board intended to enact inconsistent provisions. Since it is possible to read sections 97.82(b) and 97.83 as exceptions to Chapter 93 and section 97.82(a), we conclude that those provisions are not in irreconcilable conflict, but that the principle of §51 of the Statuory Construction Act, supra, 46 P.S. §551 applies — we can, and therefore should give effect to all of these provisions: Reese v. Hemphill, 411 Pa. 263, 191 A. 2d 835 (1963); Fidler v. Zoning Board of Adjustment of Upper Macungie Township, 408 Pa. 260, 182 A. 2d 692 (1962). Section 97.85 and Chapter 93 may well be in irreconcilable conflict; section 97.85 is not crucial to our decision, however, and will be disregarded.

10. Rochez Bros. Inc. v. Dept. of Environmental Resources, 18 Pa. Commonwealth Ct. 137, 334 A. 2d 790 (1975); East Pennsboro Township Authority v. Commonwealth, 18 Pa. Commonwealth Ct. 58, 334 A. 2d 798 (1975).

11. As well as section 4, taken in conjunction with the holding of Bortz Coal Co. v. Commonwealth, 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971), and Rochez Bros. Inc. v. Department of Environmental Resources, 18 Pa. Commonwealth Ct. 137, 334 A. 2d 790 (1975), that factors set forth in the purpose of a statute must be considered when any discretionary action is taken under that statute.

all of the factors enumerated therein must be considered in connection with exercising it.[12]

The fact that the department was required to exercise its discretion, taking certain factors into account, and did not do so, dictates at least a remand to the Department. See Burlington Truck Lines, Inc. v. United States, 371 U. S. 156, 83 S. Ct. 239 (1962); Bortz Coal Co. v. Air Pollution Commission, 2 Pa. Commonwealth Ct. 441, 279 A. 2d 388 (1971), on remand, 7 Pa. Commonwealth Ct. 362, 299 A. 2d 670 (1973).

In the recent case of Warren Sand & Gravel Co., Inc. v. Commonwealth, 20 Pa. Commonwealth Ct. 186, 341 A. 2d 556 (1975), Commonwealth Court noted (page 565 of 341 A. 2d) that the Environmental Hearing Board has the power to substitute its discretion for that of the department, at least in cases where there has been no compliance by the department with the terms of the Administrative Agency Law of June 4, 1945, P.L. 1388, as amended, 71 P.S. §§1710.1, et seq. In saying this, Commonwealth Court appeared to have been saying something very similar to what it said of its own power in Buckeye Coal Co. v. Goddard, 10 Pa. Commonwealth Ct. 15, 26-7, 309 A. 2d 431, 437 (1973), where it said:

". . . This proceeding comes to us not only without a record but without prior adversary presentation of the thing in issue. We are not, therefore,

---

12. Originally, at the hearing, we thought that it would be controlling whether the department would be required to take the factors enumerated in section 5 of The Clean Streams Law into account even in the event of a clear violation of the Regulations. Because we have concluded that the regulations themselves leave an area of discretion that requires taking those factors into account, we do not reach the issue in this adjudication.

limited in our review to determining whether the Commission's order is supported by the evidence as would be the case of an adjudication made pursuant to the Administrative Agency Law, nor are we without power to modify the questioned order as are reviewing courts in the case of motor vehicle license suspensions, nor are we prevented from altering the order as in the case of appeals from Liquor Board decisions where the findings are unchanged, nor does the Commission's order have prima facie validity as do assessment records; rather, as the first true hearing body, we render 'such decision and order as may be proper and appropriate under the circumstances.' " (Footnote omitted.)

While we are in a similar position in this case and, while we have a copious record upon which to base a decision, we would, as in other cases, refrain from making the decision, at least insofar as it involves the exercise of judgment by experts in the department, unless we were to conclude, based on applicable legal criteria, that it would be an abuse of discretion, or very close to that, for the Department to make the decision in other than a particular manner. As will be seen, we so conclude. We go on to a consideration of the decision itself, in light of applicable legal criteria.

The possible mixing zones, given the physical facts relating to the relative flows and temperatures of Spring and Bald Eagle Creeks, and of the Milesburg Power Station discharge, are (1) almost none at all,[13] (2) approximately the western one

13. Actually, even a cooling tower with closed loop cooling would require some mixing zone, since blowdown water would have to be released periodically in small quantities during critical times of the year. This would not be major, however. While

half of the lower 800 feet of Spring Creek, and a smaller portion of Bald Eagle Creek. A lesser degree of cooling, as by, e.g., a smaller cooling tower slightly lower temperature effluent might well cool sufficiently so that the mixing zone did not include any of Bald Eagle Creek; but in terms of impact on current uses of the streams in question, as well as in terms of significant deviations from water quality criteria, the principal concern, as we shall see, is with Spring Creek. In addition, the testimony did not indicate that a lesser degree of cooling would be significantly more practical or cheaper, and it strongly suggested that a lesser degree of cooling would be equally costly, at least in capital expenditures. (See Tr. 163, West Penn Exhibits #5 and 7.) The department also concluded that (a) no treatment, and (b) a cooling tower were the only two viable alternatives, and at least those were the only alternatives it treated.[14] We agree, and for the above reasons will deal with only those two.

In terms of the considerations required by sections 4 and 5 of The Clean Streams Law, we note initially that we are dealing with the restoration of a

in theory the plant could close down, resulting in no thermal effect whatsoever on Spring Creek, this is not a practical alternative, in terms of West Penn's legal obligations to provide electric service. The plant is needed for peaking power and to provide reliability of service in the area, as well as to insure that phase requirements and certain other electrical requirements of the system are met in the service area of the plant.

14. The department argued at the hearing (e.g., Tr. 286, et seq.) that the untreated water application that is directly at issue in this case must be dealt with by this Board separately and independently, and that any questions relating to the cooling tower application were and are irrelevant. We disagreed, and still disagree. The Department had both applications before it at the same time; and it both should have, and apparently did deal with them as alternatives to be compared.

stream, or portion thereof, that is currently "polluted"[15] by the addition of heat, and has been at least since 1950. The designation of Spring Creek as a cold water fishery by the Environmental Quality Board, therefore, refers to future use, at least insofar as the western half of the lower 800 feet is concerned.

The immediate and long-range economic impact upon the Commonwealth and its citizens was testified to primarily in terms of the costs of the cooling tower, and the intangible[16] costs and benefits associated with the possible future use of one half of the lower 800 feet of Spring Creek as a trout stream. The capital cost of a cooling tower would be approximately one million dollars, with the annual operating cost being approximately one-half million dollars. While we would not be willing to make a judgment that a trout stream is worth less than this—it may well be worth more[17]—one million initially, plus $0.5 million per year thereafter, is a

---

15. Change in temperature, and alteration of physical properties of the waters of the Commonwealth are included in the definition of "pollution" by the Clean Streams Law, supra, 35 P.S. §691.1, although these are not included within the definition of industrial waste. The latter fact, plus the fact that §§97.81, et seq. is included within the industrial waste portions of the regulations, is not deemed significant. The classification is taken, for our purposes here, as a matter of form, not substance. There is no question that the Clean Streams Law and regulations are applicable. There is some question, however, whether the Environmental Quality Board has defined this stream as polluted, given the provisions of §§97.82(d) and 97.83. Hence, the quotation marks.

16. See B.A. Weisbrod, Concept of Costs and Benefits, in S. T. Chase, Ed., Problems in Public Expenditure Analysis 257 (1968).

17. Sections 4(1), (2), and (4) of The Clean Streams Law certainly constitutes a warning not to undervalue such things.

large enough figure that there should be substantial evidence that significant ecological damage is occurring before we remand to the Department to make the evaluative judgment.

In a larger sense, of course, the environmental impacts on the streams, and the comparative beneficial and adverse environmental impacts of the cooling tower (which, as we have noted, is the only viable alternative) are all part of the economic impact, since these impacts all relate to the activities, values, and desires of people. Recognizing that, we will, nevertheless, deal with these other matters without trying to attack specific "price tags" in the manner of traditional economic analysis. We note again that we are dealing with essentially only two alternatives, and that we will make the decision—take it from the department—only if we find that only one of those two alternatives could be selected by a reasonable exercise of discretion.

What is the ecological impact of the discharge, exactly? To start with, Spring Creek does support trout reproduction and maintenance, although a 1971 department study (Commonwealth Exhibit no. 1) concluded that it was "marginal" because of several sewage treatment plants. The department's 1973 study (Commonwealth Exhibit no. 12) showed some trout young-of-the-year[18] below the discharge along the shore opposite the Milesburg Power Station, which may indicate some trout reproduction below the dam just upstream from the discharge. Below the discharge in Spring Creek, the 1973 study found the following significant dif-

---

18. A "young-of-the-year" is a trout less than one year old. Unless it swam in from somewhere else, its presence indicates that trout are reproducing in the area.

ferences between the area within the plume and the area along the opposite bank:

"(1) The means of diversity indices in the plume differ significantly from that out of the plume.

"The heated discharge causes an undesirable decrease in the diversity of the benthos.

"(2) The analysis reveals that interaction between locations and banks is present and significant.

"It is concluded therefore that the diversity of the aquatic community (benthos) within that area affected by the plume is significantly less than in comparable areas not affected by the plume.

"Because less diverse communities are less stable and less desirable, we conclude that the heated discharge is detrimental to the ecology of Spring Creek.[19]

"Although there was not a significant difference between fish diversity from east to west bank, an examination of the species composition at each bank is necessary (Table V). It is obvious from this analysis that:

"(1) The species composition is different between banks. The east bank, out of the plume, has a species composition comparable to the previous upstream stations. Several young-of-the-year brown trout were collected along with a three year plus resident brown, indicating reproduction and carry-over.

"(2) Within the influence of the discharge, the fish species were not comparable to those found on

19. As will be seen, the board does not feel there is substantial evidence for applying this statement beyond the area of the plume itself. Indeed, Commonwealth Exhibit 12 itself, especially the statistical analysis of the benthos, supports limiting its applicability to the area of the plume.

the east bank and were more like those of Bald Eagle Creek. Smallmouth bass and a high number of warm water shiner populations, along with the absence of white suckers and brown trout indicate a warm water environment.

"The West Penn thermal discharge therefore alters that section of Spring Creek from a cold water to a warm water fishery."

With respect to Bald Eagle Creek below the confluence, it is noted that the temperatures of Bald Eagle Creek above the confluence are actually warmer than the mixed temperature below the confluence during the warmer months of the year (June through September). On the other hand, the mixed temperature is undoubtedly higher than it would be if the power station discharge did not exist. A theoretical calculation based on the hypothesis that the plant was in full operation at critical low flow,[20] gave 12°F as the temperature rise. For more realistic conditions, using actual flows, we note that assuming complete mixing, calculated temperature increases below the confluence, based on West Penn Power Exhibit 39, Fig. 8, are in the range of 5°-6°F for about 7 months, with a maximum of 8°F in October (which is the low flow month for the combined streams). West Penn argued that the relevant comparison is with the warmer of the two merging streams — which yields the result that October is the only month when this difference is greater than 5°F.

Since the question is whether a mixing zone must

20. Defined as the seven conservative days with the lowest flow in 10 years, 100 cubic feet per second (CFS) in this case for the combined flow, 2 CFS for Bald Eagle Creek, 98 CFS for Spring Creek. See Tr. 277, et seq. The 100 CFS figure itself appears to be an estimate.

be granted, we do not think any of these comparative figures of the mixed streams is relevant. What is relevant is the shape and temperature of the thermal plume itself, its size in relation to areas outside the plume, its relation to adjacent stream temperatures outside the plume, and its temperature(s) and the temperatures of adjacent waters in relation to temperatures necessary and/or ideal for the spawning, growth, and/or survival of various species of fish. For these purposes, the information contained in West Penn Exhibit 39, Figures 9-12, in the Milesburg Seasonal Aquatic Impact Study (EHB Exhibit 1-C), especially Appendix A thereof, and in Commonwealth Exhibits 3 and 12, and testimony relating thereto, is relevant.

As we have already noted, quoting the conclusions of the Commonwealth's 1973 study, it is clear that there is an impact, even a significant impact, within the area of the thermal plume itself, in Spring Creek. This is borne out by an examination of Commonwealth Exhibit 3, showing the benthic data for each collection point along the stream transects at each station for EHB Exhibit 1-C (see sheets 3(b) and 3(g) showing Station 2 benthic data for April and June 1972; but query whether sheets 3(l) and 3(g), showing station benthic data for September and November 1972, actually show any variation across Spring Creek). Commonwealth Exhibit 3 does not show any effect for the area below the confluence of Spring and Bald Eagle Creeks, though the sampling point is below the area where West Penn Exhibit 39 would indicate any impact would be likely to be observed.

We note that the very definition of a mixing zone would imply that some impact would be likely to be observable within the mixing zone itself. The

reasonableness of selecting a particular mixing zone or, alternatively, rejecting it in a particular location, must turn on (a) the size of the zone and magnitude of impact, and (b) on whether the existence of a mixing zone of that size, and degree of impact, has significant repercussions on the biotic community of the stream as a whole.

West Penn Exhibit 39, comparing Figures 9 with 10 and 11 with 12, indicates that during October 1972, when the ambient temperature of Spring Creek was 50.4°F, and the ambient temperature of Bald Eagle Creek was about 11°F higher, the actual temperature rise of the plume was 12.9°F above the ambient temperature of Spring Creek. This made it only 2°F above the temperature of Bald Eagle Creek, meaning that the plume, as such, was not traceable beyond the junction of the two creeks. The same lack of traceableness prevailed in August 1972, when the average plume temperature rise for that month, again about 12°F, resulted in a plume temperature that was actually lower than the temperature of Bald Eagle Creek. At times when Bald Eagle Creek was cooler, and/or the power station discharge was warmer, one would expect a tongue of warmer water to extend into Bald Eagle Creek below the confluence, as shown on figures A-1-1 and A-1-3 (pages A-2 and A-4) of EHB Exhibit 1-C.

In any case, we conclude from figures 10 and 12 of West Penn Exhibit 39, when compared with figures 9 and 11, respectively, that there is an impact in Bald Eagle Creek below the confluence. In both instances the existence of the discharge results in the warmer section of Bald Eagle Creek being shifted from near the northern shore substantially southward, with the proportion of cooler water

being much reduced. This is what one would expect, given that the left half of Spring Creek (looking downstream) is being warmed to approximately the temperature of Bald Eagle Creek upstream from the confluence. In no testimony or exhibits is there any indication that the temperatures in Bald Eagle Creek, of the plume itself, are actually raised above the absolute limits of the water quality criteria for Bald Eagle Creek itself (74°F from February 15 to July 31, 87°F for the remainder of the year[21]). Assuming that plume temperatures do exceed those limits at times (and calculated mixed temperatures, not taking any cooling after discharge into account, indicate that this is possible) the indications from the evidence (see especially West Penn Exhibits 39 and EHB Exhibit 1-C) are that the area in Bald Eagle Creek within which temperatures do exceed these absolute criteria would not be extensive, and would hardly interfere at all with the use of Bald Eagle Creek as a trout stocking stream.

Any possible interference would be because trout avoid an area of high temperature. To quote William Brungs, Assistant Director of Water Quality Criteria of the Environmental Protection Agency's National Water Quality Laboratory at Duluth, Minnesota, and a recognized expert on the effects of various pollutants on fish:

"Very seldom are there fish kills due to high temperature when fish are in a natural environment in which they can move from one place to another. Fish tend to avoid high temperatures as

---

21. 74°F is the maximum temperature which adult Brown Trout can survive at all. Brook Trout can survive up to 77-78°F. The board was not concerned about survival of stocked trout other than between February 15 and July 31.

long as they can find a way out. If they are enclosed in a discharge lake or something like that, they might get trapped and might not get out and could die.

"But in this case, even at 72, [a case where the ambient stream temperature was 72°F, and heated water sufficient to increase it to 77°F was added], I would think that most of the Brown Trout would try or have been trying to find a cooler spot, deeper water or where there is a spring in the bottom of the river or something like that. They will try to find cooler conditions.

"Additional heat in this case where you have the population capable of moving and you don't—you would not have isothermal conditions, you wouldn't have 72 top to bottom, bank to bank, mile after mile. That what you would be doing is excluding a larger part of the stream to the access of the Brown Trout.

"In other words, if when it's naturally 72, the fish are excluded from some number of acres of surface water, and they are going to the cooler part, you add more heat there from whatever source, they will be excluded from even a larger area because more of the water will be unacceptable to them.

"It does not follow that you have a high temperature fish kill until essentially the whole stream becomes somewhere up in the mid seventies, and that typically on a bigger stream doesn't happen. There are cool spots. The warm water tends to flow. The surface might be 72, but it might be 65 at the bottom.

"You add more temperature to that, and essentially you will be excluding the fish from a habitat—from an increasingly larger habitat by adding more heat.''

Since the area of Bald Eagle Creek from which trout would be excluded would be fairly small, and would be temporary only (judging from the testimony) the effect on Bald Eagle Creek's use for trout stocking would be negligible.

The area involved in Spring Creek is somewhat larger, a wedge shaped segment approximately 800 feet long, about one-half the width of Spring Creek at the downstream end. In terms of the biological effect of a mixing zone of that size, trout are excluded from that area for spawning, embryo survival, and optimal growth most of the time and for maintenance for substantial periods of time. In Dr. Brung's terms, trouts are essentially excluded entirely from that portion of Spring Creek. In Karl Shaeffer's terms (Commonwealth Exhibit 12) that portion of Spring Creek is a warm water fishery.[22] There is even an initial impression from Commonwealth Exhibit 12 and EHB Exhibit 1-C that this exclusion is large enough to affect the productivity of the opposite half of the stream as a cold water fishery. The number of young-of-the-year trout on that shore is not as great as the number from upstream stations.

On the other hand, one would expect it to be less than half as great, since a very restricted area near one shore was being collected from, whereas larger areas were being collected from upstream. The sample size is too small to really have much confidence in a statistical statement, but the collection of two young-of-the-year does not appear to be far

22. We note that no expert was willing to testify that trout would spawn in the area now occupied by the plume in the event that a cooling tower was installed and operated, although it was felt that they would at least inhabit that area.

out of line, slightly depressed perhaps, but not such that one can confidently say that there is an effect on the stream other than in the plume itself.

The statistical analysis that was done, on benthic microinvertebrates, tends to show no significant difference between the east bank (opposite the discharge) and upstream stations. See Commonwealth Exhibit 12, and testimony relating thereto. This tends to indicate that the warming of the western half of the lower 800 feet of Spring Creek is not having a significant impact on the ecosystem of the remainder of the stream.

We note, in addition, that the alternative to allowing a mixing zone, as indicated on West Penn Exhibit 39 and Appendix A of EHB Exhibit 1-C would result in significant fog creation in the area, which contains a major highway interchange between Interstate Route 80 and U. S. Route 322.[23]

We have, then, a situation where the building of a cooling tower at a capital cost of nearly one million dollars and an annual operating cost of nearly one-half million dollars and at a probable cost of significant additional fogging in an area occupied by a major highway interchange, would probably produce additional habitat for young and adult trout in a wedge-shaped area of Spring Creek 800 feet long and 40 feet wide at its lower end, and might produce some additional spawning sites for trout in the same wedge-shaped area. We are mindful that the cost of this cooling tower should very likely be borne by already overburdened consumers of electricity.

---

23. Testimony as to these effects was objected to by the department at the hearings on the grounds that West Penn had not brought such effects to the department's attention during its consideration of the applications. We held that it was admissible.

Such an imposition does not seem justified where the environmental benefit is minimal and possibly, on balance, even negative.

Taking all factors into account, and giving due consideration both to the policies of section 4 of The Clean Streams Act and to the high priority given environmental concerns under article I, sec. 27, of the Constitution of Pennsylvania, as well as to the regulations and other provisions of The Clean Streams Law, we conclude that the department, in the proper exercise of discretion, could not reasonably conclude that the use of the mixing zone that has been used by West Penn since 1950 should be discontinued, given benefits of doing so and the methods and costs of discontinuing it.

Accordingly, we will order the issuance of the industrial waste permit the denial of which was appealed from in this case.

## CONCLUSIONS OF LAW

1. This board has jurisdiction over this case and over the parties before it.

2. The department has discretion under chapter 93, and sections 97.81, 97.82, 97.83, and 97.85 of the regulations, 25 Pa. Code, Chapter 93 and sections 97.81, 97.82 and 97.83, read together, to designate a reasonable mixing zone for the heated effluent from the Milesburg Power Station where the facts demonstrate that there is little or no impact on the streams in question outside the mixing zone.

3. In exercising that discretion, the department is required to take into account the factors set forth in sections 4 and 5 of The Clean Streams Law, supra, and article I, sec. 27, of the Constitution of Pennsylvania, and in so doing to compare alterna-

tive mixing zones in order to determine what the environmental and economic opportunity costs of allowing a particular mixing zone might be.

4. Under the facts of this case, it would be an abuse of discretion for the department to refuse to allow a mixing zone essentially equivalent to what appellant has been using for the past 25 years, where the only practicable alternative would be to require the construction of a cooling tower, with a very minimal mixing zone, and with substantial economic and environmental costs as enumerated in this opinion.

## ORDER

And now, September 17, 1975, the above-captioned appeal of West Penn Power Company is sustained, and the department is hereby ordered to issue an industrial waste permit to West Penn Power Company pursuant to that company's application no. 1472205.